UNITED STATES DISTRICT OF NEW YORK
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------------X
COMPLETE MEDICAL CARE SERVICES OF NY, PC d/b/a COMPLETE CARE, ARIC HAUSKNECHT, M.D., MARLENE BRIONES FRANCO, LCSW, STACEY JAFF, M.D., JONATHAN KENT, PsyD, and JASON MAAS, P.A., individually and on behalf of all others similarly situated,

Plaintiffs,

-against-

JAMES A. TACCI, M.D., J.D., M.P.H. (FACOEM, FACPM), as the Medical Director of the NEW YORK STATE WORKERS' COMPENSATION BOARD, HEATHER MACMASTER, as General Counsel to the NEW YORK STATE WORKERS' COMPENSATION BOARD, STEVEN SCOTTI, as the Executive Director of the NEW YORK STATE WORKERS' COMPENSATION BOARD, CHRISTOPHER FALING as the Principal Workers' Compensation Examiner of the NEW YORK STATE WORKERS' COMPENSATION BOARD, FREIDA D. FOSTER, as the Chair and Commissioner of the NEW YORK STATE WORKERS' COMPENSATION BOARD, RENEE DELGADO, as the Vice Chair of the NEW YORK STATE WORKERS' COMPENSATION BOARD, PAMELA CAGGIANELLI, as a board member of the NEW YORK STATE WORKERS' COMPENSATION BOARD, ROBERT BERGIN, as a board member of the NEW YORK STATE WORKERS' COMPENSATION BOARD, STEVEN A. CRAIN, as a board member of the NEW YORK STATE WORKERS' COMPENSATION BOARD, CLARISSA M. RODRIGUEZ, as a board member of the NEW YORK STATE WORKERS' COMPENSATION BOARD, PETER DE JESUS, JR., as a board member of the NEW YORK STATE WORKERS' COMPENSATION BOARD, MARIA MATOS, as a board member of the NEW YORK STATE WORKERS' COMPENSATION BOARD, GINA SILLITTI, as a board member of the NEW YORK STATE WORKERS' COMPENSATION BOARD, MARTIN M. DILAN, as a board member of the NEW YORK STATE WORKERS' COMPENSATION BOARD, MARK HIGGINS, as a board member of the NEW YORK STATE WORKERS' COMPENSATION BOARD, GIORIBELLE PEREZ, ESQ., as a board member of the NEW YORK STATE WORKERS' COMPENSATION BOARD, and SAMUEL G. WILLIAMS, as a board member of the NEW YORK STATE WORKERS' COMPENSATION BOARD,

Defendants.
---------------------------------------------------------------------------------X

Case No.: 25-CV-8055

**CLASS ACTION**
**<u>COMPLAINT</u>**

Plaintiffs Complete Medical Care Services of NY, PC d/b/a Complete Care ("**Complete Care**"), Aric Hausknecht, M.D. ("**Dr. Hausknecht**"), Marlene Briones Franco, LCSW ("**Franco**"); Stacey Jaff, M.D. ("**Dr. Jaff**"), Jonathan Kent, PsyD ("**Dr. Kent**") and Jason Maas, P.A. ("**Maas**"; collectively, "**Plaintiffs**"), individually and on behalf of all others similarly situated, by and through their attorneys, Weiss Zarett Brofman Sonnenklar and Levy, PC, as and for their complaint against Defendants Freida D. Foster (the "**Foster**"), as the Chair and Commissioner of the New York State Workers' Compensation Board ("**WCB**"), James A. Tacci, M.D., J.D., M.P.H. (FACOEM, FACPM) ("**Tacci**"), as the Medical Director of the WCB, Heather MacMaster ("**MacMaster**"), as General Counsel to the WCB, Steven Scotti ("**Scotti**"), as Executive Director of the WCB, Christopher Faling ("**Faling**"), as the Principal Workers' Compensation Examiner of the WCB, Renee L. Delgado, Esq., as the Vice Chair of the WCB ("**Delgado**"), Robert Bergin, as a board member of the WCB ("**Bergin**"), Pamela Caggianelli, as a board member of the WCB ("**Caggianelli**"), Steven A. Crain, as a board member of the WCB ("**Crain**"), Peter De Jesus, Jr., as a board member of the WCB ("**De Jesus**"), Marin M. Dilan, as a board member of the WCB ("**Dilan**"), Mark Higgins, as a board member of the WCB ("**Higgins**"), Maria Matos, as a board member of the WCB ("**Matos**"), Clarissa M. Rodriguez, Esq., as a board member of the WCB ("**Rodriguez**"), Gioribelle Perez, Esq., as a board member of the WCB ("**Perez**"), Gina Sillitti, as a board member of the WCB ("**Sillitti**"), and Samuel G. Williams, as a board member of the WCB ("**Williams**") (collectively, "**Defendants**" or the "**Board**"), allege as follows:

## PRELIMINARY STATEMENT

1. This is an action for declaratory and injunctive relief brought by Plaintiffs, individually and on behalf of all others similarly situated, against Defendants who administer the WCB.

2. Plaintiffs, and other Workers' Compensation ("**WC"**) providers like Plaintiffs (the "**Class**"), are being repeatedly and consistently denied their constitutional and statutory right to adequate notice and an opportunity for a fair hearing before being deprived of payments related to their medical treatment of WC patients.

3. Plaintiffs and the Class are medical providers in the WC system.

4. As WC providers, Plaintiffs and the Class provide medical treatment to injured workers in New York.

5. As WC providers, Plaintiffs and the Class expend both resources and labor in treating WC patients.

6. Claims related to Plaintiffs' and the Class's treatment of WC patients are submitted to insurance carriers that participate in the WC system.

7. These insurance carriers are expected to pay the WC providers' medical bills related to treatment of injured workers.

8. It is common for WC providers to wait months or even years before they receive payment for their services.

9. Much of the treatment provided by Plaintiffs and the Class is pre-authorized as codified in the New York State WC Medical Treatment Guidelines ("**MTG**").

10. Frequently, Plaintiffs and the Class are required to seek and receive prior authorization from the insurance carriers and/or the WC Medical Director's Office ("**MDO**") for the treatment they provide to WC patients.

11. Nevertheless, often, insurance carriers dispute or simply ignore claims submitted by Plaintiff and the Class seeking to get paid for the treatment they provide to WC patients.

12. When this occurs, Plaintiffs and the Class are not permitted to recover payment for the medical bills from the injured workers, and to do so would violate New York WC Law ("**WCL**").

13. Plaintiffs and the Class are also not permitted to commence a legal action against the insurance carriers to recover payment for their treatment of WC patients under WCL.

14. Instead, Plaintiffs and the Class can only submit a Form HP-1.0 ("**HP-1**") to the WC Disputed Medical Bills Office ("**DMB**") concerning the disputed or unpaid claims.

15. Prior to 2022, the WCB would review the HP-1 submissions, generally direct the WC providers and insurance carriers to submit necessary documentation and then adjudicate the dispute and render a determination after both the WC providers and insurance carriers had an opportunity to be heard.

16. In the event the WCB rendered a determination on the disputed claim in favor of Plaintiffs or the Class, the WCB then issued an Award (referred to as an "**HP-2**") indicating the amount due to the WC provider along with statutory interest.

17. If needed, Plaintiffs and the Class would then be able to pursue further remedy in the New York State Courts against the insurance carrier to collect what was due along with statutory interest.

18. However, beginning in or about some time in 2022, the Board overhauled the WCB's process related to HP-1s, eliminating both adequate notice and a sufficient opportunity for Plaintiffs and the Class to be heard on claims submitted by WC providers for medical treatment they provided to injured workers, including, *inter alia*, foreclosing Plaintiffs and the Class from being granted adjudication on the disputed or unpaid claims that are the subject of their HP-1 submissions.

19. According to information obtained through a FOIA request, in 2022, 140,645 HP-1s were submitted and 90,628 HP-2s were ultimately granted to WC providers against the insurance carriers for unpaid bills (64% in favor of the WC providers).

20. Conversely, this FOIA request also revealed that in 2024, 139,127 HP-1s were submitted and 44,660 HP-2s were ultimately granted to WC providers against the insurance carriers for unpaid bills (32% in favor of the WC providers).

21. It is standard in the WCB process for there to be some delay between the submission and processing.

22. However, the difference in the number of HP-1 rejections between 2022 and 2024 is staggering and suggests that the Board's overhaul of the HP-1 determination process has doubled the amount of rejections of WC providers' requests for payment of bills left unpaid by insurance carriers.

23. According to the WCB website, Plaintiffs and the Class have no standing to participate in a hearing when bills are disputed between a WC patient and insurance carriers before a WCB Administrative Law Judge ("**ALJ**").

24. Moreover, WC providers are not permitted to appear before the ALJ or submit any evidence on their own behalf.

25. In contrast, insurance carriers and their representatives are permitted to appear before the ALJ and submit evidence on their own behalf.

26. The WCB also does not permit WC providers to appeal ALJ determinations.

27. In contrast, insurance carriers and their representatives are permitted to appeal ALJ determinations.

28. The Board's overhaul of the WCB has done nothing but disadvantage Plaintiffs and the Class, leaving them with a less than one in three chance that the WCB will compel the insurance carrier to pay, with no opportunity to be heard before a determination is made on their HP-1 submissions nor any opportunity to appeal once a decision is rendered.

29. Specifically, since some time in or about 2022, Defendants have and continue to:

a. fail to timely render determinations and notices thereof to WC providers with respect to their HP-1 submissions requesting decisions on unpaid medical bills by insurance carriers;

b. provide inadequate notices to WC providers which fail to explain how determinations regarding HP-1 submissions were decided and/or citing inapplicable or inaccurate reasons for failing to consider and/or deny HP-1 submissions;

c. fail to offer WC providers notice or opportunity to be heard with respect to their HP-1 submissions before rendering determinations on HP-1 submissions and depriving Plaintiffs and the Class of property, i.e. payment for their expenses and labor related to the treatment of injured workers;

d. deprive WC providers any opportunity for hearings before an ALJ for bills denied by Form C-8.1 (further defined herein) or for any appellate review on HP-1 determinations; and

e. permit insurance carriers to issue repeat denials for services that have already been found in favor of the WC provider by the ALJ.

30. These improper practices and clear due process violations have caused Plaintiffs and the Class to suffer significant deprivation of property since some time in or about 2022 and will cause Plaintiffs and the Class to continue to suffer a deprivation of property without procedural due process.

31. Plaintiffs and the Class are deprived of any recourse when they are not paid by insurance carriers for services they rendered and goods provided to WC patients and the Board denies Plaintiffs and the Class an opportunity to be heard before the WCB and rejects WC providers' requests for payment.

32. As a result, since some time in or about 2022, Plaintiffs alone have lost at least $575,000 in compensation related to their treatment of WC patients without adequate notice or an opportunity to be heard.

33. Moreover, absent declaratory and injunctive relief from this Court, Plaintiffs and the Class are at risk of losing an untold amount of future payments earned through treating WC patients without adequate notice and opportunity to be heard.

34. Defendants' actions will only continue to deny WC providers adequate notice and an opportunity to be heard with respect to denied bills and HP-1 submissions.

35. The Board's failure to provide WC providers with adequate notice and an opportunity to be heard before rendering decisions on HP-1 submissions deprives Plaintiffs and the Class of payment for services they provided to treat WC patients, thereby violating Plaintiffs' and the Class's Due Process guarantees under the Fourteenth Amendment of the Unites States Constitution and Article 1 § 6 of the New York State Constitution.

## JURISDICTION AND VENUE

36. Jurisdiction arises under 28 U.S.C. §§1331 and 1343(3) which grant to this court jurisdiction under the constitution and laws of the United States without regard to the amount in controversy. Jurisdiction is conferred over the state law claims under the doctrine of pendent jurisdiction.

37. Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 220 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

38. Plaintiffs' claims are also authorized by 42 U.S.C. § 1983 which provides redress for the deprivation under color of law of rights, privileges and immunities secured to all citizens by the United State Constitution and by Acts of Congress.

39. Venue properly lies in this district pursuant to 28 U.S.C. §1391(b).

## PARTIES

40. Complete Care is a professional corporation authorized to provide medical services in New York with offices located in Bronx, New York and New York, New York.

41. Dr. Hausknecht is an individual with an address in New York, New York.

42. Franco is an individual with an address in Bronx, New York.

43. Dr. Jaff is an individual with an address in New York, New York.

44. Dr. Kent is an individual with an address in New York, New York.

45. Maas is an individual with an address in New York, New York.

46. Tacci is the Medical Director of the WCB and has responsibility for the WCB's compliance with law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

47. MacMaster is the General Counsel to the WCB and has responsibility for the WCB's compliance with law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

48. Scotti is the Executive Director of the WCB and has responsibility for the WCB's compliance with the law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

49. Faling is a Principal Workers' Compensation Examiner at the WCB and has responsibility for the WCB's compliance with the law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

50. The WCB is a 13-member body appointed by the Governor and confirmed by the State Senate.

51. Foster is the Chair and Commissioner of the WCB and has responsibility for the state agency's compliance with law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

52. Delgado is the Vice Chair of the WCB and has responsibility for the state agency's compliance with law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

53. Caggianelli is a board member of the WCB and has responsibility for the state agency's compliance with law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

54. Crain is a board member of the WCB and has responsibility for the state agency's compliance with law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

55. Rodriquez is a board member of the WCB and has responsibility for the state agency's compliance with law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

56. Dilan is a board member of the WCB and has responsibility for the state agency's compliance with law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

57. Higgins is a board member of the WCB and has responsibility for the state agency's compliance with law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

58. Perez, Esq. is a board member of the WCB and has responsibility for the state agency's compliance with law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

59. Williams is a board member of the WCB and has responsibility for the state agency's compliance with law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

60. Bergin is a board member of the WCB and has responsibility for the state agency's compliance with law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

61. De Jesus is a board member of the WCB and has responsibility for the state agency's compliance with law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

62. Matos is a board member of the WCB and has responsibility for the state agency's compliance with law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

63. Sillitti is a board member of the WCB and has responsibility for the state agency's compliance with law, including the administration and supervision of Form HP-1.0 submissions and determinations in the State of New York.

## STATEMENT OF FACTS

### A. The New York WC System

64. The WC system is a program that guarantees medical care and disability benefits to people who have been injured on the job.

65. Payments to injured employees are paid under the purview of the WCB pursuant to WCL.

66. The WC system is a no-fault system.

67. Under WCL, almost all employers in New York are required to be insured against WC claims.

68. Under WCL, employees may not be required to contribute to the cost of such coverage.

69. Rather, WC providers are paid for their services by insurance carriers.

70. This ensures that workers are not forced to pursue a civil suit against their employers in order to have a remedy against a workplace injury.

71. Late payments by insurance carriers are subject to statutory interest.

72. The WCB has stated that its goal is to provide a swift and sure source of benefits to injured employees by increasing healthcare provider participation in its system so that New York's injured workers have better access to high-quality medical care.

73. There is a severe shortage of doctors that are willing to accept WC patients in New York State.

74. Only ten percent (10%) of all eligible medical providers in New York State are authorized to treat WC patients.

75. Currently, only providers authorized by the Board may treat injured workers in New York State.

76. Access to medical care for injured workers in New York State is severely limited, particularly with respect to certain medical specialists.

77. A major reason that medical providers do not accept WC patients and/or are leaving the WC system is due to the resistance of insurance carriers to pay medical bills and the lack of due process afforded to WC providers by the Board with respect to their claims for payment.

78. Moreover, the WCB's due process violations have extended beyond their claims protocols to their licensing process, too.

79. Recently, the WCB has been accused of aggressively forcing physicians with long and unblemished records out of the WC system without due process by revoking their license without a hearing, threatening to revoke their license if they do not resign, or denying their renewal application without cause.

80. The WCB's tactics have allegedly created a WC provider shortage that leaves injured workers waiting longer for treatment, with fewer specialists willing to risk retaliation by insurers, their allies and likely the Board itself.

81. Taken together, the WCB's extreme denial of claims and removal of physicians raises serious concerns about its motives.

**B. Plaintiffs are WC Providers**

82. Dr. Hausknecht is a neurologist and pain management specialist licensed to practice medicine in New York since 1992

83. Complete Care was formed on or about December 28, 1999 by Dr. Hausknecht.

84. Complete Care has thus been providing medical services in New York for over twenty-five (25) years.

85. Complete Care's practice focuses on, *inter alia*, treatment and evaluation of neurologic and musculoskeletal conditions and injuries.

86. Complete Care has been treating injured workers as part of the WC system since it was formed in 1999, providing medical services to WC patients.

87. Currently, four of Complete Care's providers are authorized to treat injured workers in the WC system: Franco, Dr. Jaff, Dr. Kent and Maas.

88. Dr. Hausknecht was also authorized to treat workers as part of the WC system from 1996-2023.

89. The terms of Dr. Hausknecht's Resignation Agreement with the WCB ensure that he is permitted to pursue compensation for unpaid bills indefinitely.

90. Complete Care's providers collectively render hundreds of treatments to WC patients annually.

91. As such, Complete Care is a significant contributor to the WC system.

92. Complete Care is authorized to pursue collections for services rendered by its WC providers.

93. In addition, when he was an authorized WC provider, Dr. Hausknecht himself also rendered hundreds of treatments to WC patients annually.

**C. The WCB Process for Contesting Payment for Medical Treatment Prior to 2022**

94. The WCB promulgated regulations for the criteria of medical treatment of WC patients.

95. When a worker is injured, and the injury is properly reported to the employer and established by the WCB, the insurance carrier then begins payment of the benefits due to the injured employee.

96. An injured worker may be treated by a healthcare provider authorized to provide WC services, such as Plaintiffs and the Class.

97. For certain treatments, a WC provider must contact the insurance carrier to obtain prior authorization before performing the services.

98. Under WCL, WC providers are never permitted to charge the injured worker for their services or the treatment they provide to the injured worker.

99. Instead, the WC provider may only bill the insurer for the services provided to WC patient, within 120 days of the date of service.

100. All WC services are billed according to the guidelines of the WC fee schedule, which provides the approved compensation rates for medical services provided to injured workers (the "**Fee Schedule**").

101. The insurance carrier must pay or deny the claim within 45 days of receipt.

102. If the insurance carrier denies the claim for reasons such as "claim has been controverted," "prior authorization was not granted," "diagnostic test was performed outside of network," or "treatment provided was not based on correct application of the Guidelines," a Notice of Treatment Issue/Disputed Bill ("**Form C-8.1**") must be sent to the WC provider and to the WCB.

103. If the insurance carrier denies the claim or a portion of the claim for reasons such as "amount of bill is excessive" or "treatment is excessive," a Notice to Health Care Provider and Injured Worker of a Carrier's Refusal to Pay All (or a Portion of) a Medical Bill Due to Valuation Objection(s) ("**Form C-8.4**") must be sent to the WC provider and to the WCB.

104. If the WC provider believes that payment is due despite these denials by the insurance carrier and either a minimum of 45 days has elapsed since the submission of the bill or 30 days since the date of a final decision is made by an ALJ establishing the insurance carrier's or self-insurer's liability for the bill and no more than 120 days have elapsed, a Request for Decision on Unpaid Medical Bills (i.., the HP-1) must be filed online with DMB.

105. An injured worker typically begins treatment immediately after the injury occurs, usually before the WCB reviews the matter.

106. Accordingly, when the insurer provides a notice of controversy to the injured worker, treatment to the injured worker may have already begun or been completed by the WC provider before the claim has been reviewed by the WCB.

107. If an insurance carrier has not timely responded to the WC provider, or a Form C-8.1 has been found in favor of the WC provider, and a bill is past due, the WC provider's only legal remedy is to request assistance from the WCB by filing an HP-1.

108. If an insurance carrier files a Form C-8.4, the WC providers' only legal remedy is to request assistance from the WCB by filing an HP-1.

109. Upon receipt of an HP-1, the WCB is tasked with resolving the medical billing issues.

110. Prior to 2022, the WCB resolved medical bill issues raised in an HP-1 through administrative decisions, a conciliation process, or a hearing before an arbitration panel.

111. Prior to 2022, in certain other circumstances, such as if the insurance carrier timely objected to the bill with a Form C-8.1, the matter was adjudicated by an ALJ.

112. Once an administrative decision becomes final, WC patients and insurance carriers have thirty (30) days to file a request for administrative review of a decision by an ALJ.

113. However, the WC provider does not have the right to request administrative review of the decision by the ALJ, even though this often concerns a determination of Form C-8.1 objections against the WC provider's billing.

114. An insurance carrier may object to an HP-2 Award.

115. However, HP-2 Awards are not subject to review or appeal if requested by the WC provider.

116. On many occasions, insurance carriers object to an HP-2 Award by submitting proof of payment, albeit untimely.

117. In such cases, the Board issues a Form HP-3, rescinding the HP-2 Award for the WC provider, including interest due under 12 CRR-NY § 300.19.

118. If the insurance carrier fails to pay an administrative award or arbitration award after a it is directed to by the WCB, the WC provider may submit a Provider's Request For Judgment Of Award

Section 54-B, Enforcement on Failure to Pay Award or Judgment ("**Form HP-J1**"), requesting consent to file a Judgment in Court.

119. The WCB is obligated to assist in this process every step of the way.

**D. The WCB Process for Payment for Medical Testimony**

120. Under Title 12, § 301.1 of the New York Administrative Code, WC providers who are required to attend a hearing of an injured employee are entitled to a fee.

121. According to the WCB, "within 10 days of the completion of a witness's deposition, the party responsible for such witness's fee, if any, pursuant to the [WCL] and regulations, shall remit payment of the fee to the witness."

122. According to the Fee Schedule, the predetermined fee is $450 for a medical doctor and $350 for a physician assistant, psychologist or social worker.

123. If WC providers do not receive the witness fee within ten (10) days, they must first write to the payor stating that they have not been paid. Then, if WC providers do not receive payment within ten (10) days of the letter, they must write to the WCB to request payment.

124. WC providers are not permitted to file HP-1s for unpaid witness fees and there is no other administrative or legal remedy other than to petition the WCB for assistance.

125. WC providers are entitled to statutory interest under 12 CRR-NY § 300.19.

126. The Board has failed to compel insurance carriers to pay interest.

127. The Board has no process in place for WC providers seeking interest on late witness fees.

**E. The Board Changes the WC System at Some Time in or Around 2022**

128. At some time in or around 2022, the Board publicly, via online bulletin, recognized that the WC system suffered from administrative delays due to the high volume of claims submitted.

129. At that time, in or around some time in 2022, the Board could take up to two years to process HP-1s.

130. The Board thus began restructuring the system to allegedly improve the efficiency of the medical billing dispute process, with the goal of reducing backlog and improving turnaround times so that WC providers would receive the payments they are due in less time.

131. Part of the overhaul of the system included instituting a paperless claims system for submitting HP-1s, as well as an online prior authorization request process for medication, durable medical equipment and medical treatment or testing.

132. The Board's overhaul did reduce backlog and increase turnaround time to approximately two months, as opposed to the approximately two years it took prior to the overhaul.

133. In July 2024, the Board reported that there were approximately 90% fewer outstanding HP-1s compared to the year before.

134. However, according to information obtained through a FOIA request, this drastic decrease in turnaround time was due in part to a greater number of rejections of HP-1s, resulting in a decreased number of HP-1 awards.

135. Upon information and belief, most of the HP-1 rejections since the Board implemented these changes were issued by the WCB without giving WC providers adequate notice or an opportunity to be heard.

136. By increasing the number of rejections of HP-1s, the Board was able to decrease WCB's response time, which was the Board's goal.

137. Based on the New York State Workers' Compensation Board - Office of General Counsel FOIL Records Request No. F000136-040925, the results of this HP-1 overhaul are illustrated in the following table:

| | HP-1s Submitted | HP-2 Awards Created | HP-1s Rejected or Not Processed | Other Statuses | HP-3.1's Created | Rejection Rate |
|---|---|---|---|---|---|---|
| 2022 | 140,645 | 100,032 | 39,434 | 1,179 | 9,404 | 28% |
| 2024 | 139,127 | 49,306 | 86,099 | 3,722 | 4,645 | 62% |

138. The WCB allows only an injured worker, employer or an employer's WC insurance carrier – those whom the WCB considers "part[ies] of interest" – to attend a hearing, file an appeal or request an administrative review of the WCB's decision.

139. Otherwise, the WCB and ALJ decisions are final.

140. The WCB explicitly states on its website that "Doctors, pharmacies and other medical service providers may not appeal" a WCB decision.

141. Thus, Plaintiffs and the Class have no opportunity to be heard on their claims to recover payment or reimbursement for services and goods they provided to injured workers, including labor and durable medical equipment.

142. The Board fails to provide WC providers a hearing when an HP-1 is rejected and prohibits WC providers from appealing a rejected HP-1, leaving WC providers with no form of relief when their HP-1 is rejected and they do not receive the payment that they are entitled to from the insurance carrier.

143. Beginning in or around some time in 2022, since the Board overhauled the process, the WCB has practically eliminated opportunities for WC providers to have their claims and disputes with insurance carriers over payments heard by DMB or an ALJ.

144. The Board has indicated that rejected HP-1s are final and not subject to review or appeal, even inf the Board has made an error.

145. Instead, the Board has circumvented the process at the initial HP-1 submission stage, rejecting HP-1s sometimes in as little as two days with little to no explanation provided.

146. Despite Plaintiffs' and the Class's attempts to follow up with the WCB concerning rejected HP-1s and to submit corrected HP-1s, the WCB is generally nonresponsive, unreceptive or, in many cases hostile.

147. Further, New York State Workers' Compensation Board - Office of General Counsel FOIL Records Request No. F000326-07312 revealed that insurance carriers filed a total 2,903,201 denials to

medical bills either under Form C-8.1 or Form C-8.4 in 2023 and another total 3,051,408 denials to medical ills either under Form C-8.1 or Form C8.4 in 2024.

148. WC providers have no standing or any due process to adjudicate the Form C-8.1 denials filed by insurance carriers and due process to adjudicate the Form C-8.4 denials filed by insurance carriers, depriving WC providers payment on millions of medical bills for services they provided WC patients.

**F. Plaintiffs Experience Procedural Barriers as WC Providers in the WC System**

149. Between the years 2022 and 2025, Plaintiffs submitted approximately a thousand HP-1s to the WCB, which were rejected for various reasons.

150. The majority of these rejections were received within thirty (30) days of submission.

151. Each of these HP-1s was rejected for various alleged reasons, including, but not limited to: failing to submit supporting documentation; failing to attach the required provider type form with detailed narrative to the carrier; submitting more than one request for an Administrative Award/Arbitration for each date of service; lack of medical necessity; failing to submit all procedures billed/performed by the same provider on the same day on one bill with one total; or failing to use the proper billing form with Doctor's Report of MMI/Permanent Impairment ("**Form C-4.3"**).

152. Many of the rejections were based upon the failure of DMB to locate the bills in the electronic case file ("**ECF**").

153. However, on numerous occasions when the Board rejected on this basis, the bills were, in fact, in the ECF.

154. The Board, insurance carriers, insurance carriers' designated representatives and injured workers' attorneys all have access the ECF.

155. In contrast, WC providers are prohibited form accessing the ECF, even with consent from the injured worker.

156. WC providers, therefore, are unfairly prejudiced by their inability to access the ECF to confirm that bills were submitted and retrieve the subject document ID numbers.

157. Many of the rejections were also based upon the failure of DMB to properly interpret the ALJ's determination on Form C-8.1 objections.

158. Even when Plaintiffs attempted to resubmit corrected forms according to the WCB's instruction, Plaintiffs would often receive no response from the WCB.

159. When a WC provider has a substantive response to the WCB's determination on an HP-1 submission, there is no formal next step, notice or opportunity to be heard that is afforded to the WC provider.

160. Instead, the Board considers the WCB's decisions on the initial HP-1 submission to be final and not subject to review or appeal.

161. Additionally, there are numerous instances where HP-1s cannot be submitted online due to timeliness issues (>120 days), typically due to failures by the WCB to send timely notice to the WC provider.

162. For example, repeatedly, the Board has failed to send an ALJ's decision to the WC provider that resolves a disputed bill, and by the time it is discovered by the WC provider, it is too late to submit a Form HP-1.

163. Despites being notified of this issue and receiving requests to upgrade the system to allow for untimely HP-1 submissions with reasonable explanations, the WCB has taken no measures to address this situation.

164. The Board provides no sort of hearing process before depriving WC providers of compensation they are duly owed for services they provided to injured workers.

165. The Board also wrongfully denies WC providers statutory interest owed on unpaid bills.

**G. Plaintiffs Contact the WCB Repeatedly, to no Avail.**

166. Plaintiffs diligently monitored the HP-1 rejections they received improperly and spent time calling and emailing the WCB, including MDO, DMB and the Office of General Counsel ("**GCO**"), to report the issues they faced as participants in the WC system.

167. Often times, Plaintiffs' calls and emails remained unanswered.

168. On June 18, 2024, Plaintiffs sent a letter to the WCB with proper supporting documentation relating to an HP-1 which was denied on the grounds that the request could not be processed due to Plaintiffs' alleged failure to attach supporting documentation for the medical necessity of the services provided.

169. The HP-1 was denied despite Plaintiffs never receiving adequate notice or an opportunity to be heard on the claim.

170. Plaintiffs' original submission contained a Letter of Medical Necessity with a detailed analysis of medical and regulatory support for the services provided.

171. Had Plaintiffs been provided adequate notice or an opportunity to be heard, they would have presented this analysis to the WCB.

172. This HP-1 was submitted for services amounting to $2,763.90, which remains unpaid to date.

173. Plaintiffs did not receive a response to their June 18, 2024 letter.

174. After receiving multiple rejections by the WCB to pay for services provided by one of Complete Care's alleged "chiropractors," on September 12, 2024, Plaintiffs sent a letter to the WCB explaining that the provider (Dr. Jaff) was not a chiropractor and, moreover, that the WCB's guidelines support the provider's service, and thus the WCB's rejection of an HP-1 on this basis was improper.

175. Plaintiffs did not receive adequate notice nor an opportunity to be heard before this HP-1 was rejected.

176. Had Plaintiffs been provided adequate notice and an opportunity to be heard, Plaintiffs would have explained that Dr. Jaff, who rendered the services at issue, was not a chiropractor and how the WCB's guidelines support the provider's service.

177. Despite multiple attempts to contact the WCB, no resolution was reached, Plaintiffs were never afforded an opportunity to be heard, and the bills remain unpaid to date.

178. Also on September 12, 2024, Plaintiffs sent a letter to the WCB explaining that the WCB's guidance regarding the multi-page and formatting issues was unclear, resulting in improper HP-1 rejections for these reasons.

179. Once again, Plaintiffs received neither adequate notice nor an opportunity to be heard before receiving these HP-1 rejections.

180. Had Plaintiffs been afforded adequate notice and an opportunity to be heard, Plaintiffs would have explained how the WCB's guidance regarding the multi-page and formatting issues was unclear.

181. Plaintiffs followed this letter with several emails to the WCB regarding this issue, but no resolution has been reached to date, Plaintiffs were never afforded an opportunity to be heard, and the bill remains unpaid.

182. Also on September 12, 2024, Plaintiffs sent a letter to the WCB explaining that HP-1s submitted for the same dates of services were due to coverage by different payors which received different bills, leading to improper HP-1 rejections by the WCB.

183. Plaintiffs received neither adequate notice nor an opportunity to be heard before these HP-1s rejections were issued.

184. Had Plaintiffs been afforded adequate notice and an opportunity to be heard, Plaintiffs would have explained how HP-1s submitted for the same dates of services were due to coverage by different payors, as required by the Board, which were submitted on separate bills.

185. Plaintiffs followed this letter with numerous emails to the WCB regarding this issue, but no resolution has been reached to date, Plaintiffs were never afforded an opportunity to be heard, and the bill remains unpaid.

186. Also on September 12, 2024, Plaintiffs sent a letter to the WCB detailing their many attempts to seek assistance from the WCB in receiving payment they are owed for medical testimony.

187. In the letter, Plaintiffs informed the WCB that they were not paid for thirty-three (33) depositions they participated in despite complying with the WCB's guidelines for requesting assistance after a WC provider is unpaid for medical testimony.

188. Despite Plaintiffs' compliance with WCB's guidelines, the WCB consistently failed to take any action to ensure Plaintiffs were paid for the medical testimony they provided nor were Plaintiffs afforded an opportunity to be heard with respect thereto.

189. Also on September 12, 2024, Plaintiffs sent a letter to the WCB informing the WCB that Plaintiffs had received over 200 HP-1 rejections based upon "lack of medical necessity."

190. These HP-1 rejections were issued without adequate notice or an opportunity to be heard provided to Plaintiffs.

191. In the letter, Plaintiffs explained that the HP-1s had all met the WCB's criteria and thus, the rejection on this basis was improper.

192. Furthermore, Plaintiffs explained that many of the bills for which the HP-1s were submitted involved medical or psychological office visits, which do not require submission of medical necessity.

193. Had Plaintiffs been given adequate notice and an opportunity to be heard, they would have demonstrated why the HP-1 rejections were improper as outlined above.

194. Plaintiffs also reiterated in the letter their efforts to contact MDO and the DMB to resolve the issue, but they did not receive a response for several weeks until the DMB responded simply stating, in boilerplate fashion, that the specific WC provider should contact them if there was a question regarding the HP-1 rejections.

195. However, the WCB failed to address Plaintiffs' requests to reconsider the HP-1 rejections and direct payment, nor provided Plaintiffs any opportunity to be heard.

196. Also on September 12, 2024, Plaintiffs sent a letter to the WCB notifying the WCB that it received multiple HP-1 rejections due to one of Complete Care's providers, Dr. Jaff, performing NCV/EMG studies on the basis that "Dr Jaff is a chiropractor."

197. The WCB rejected these HP-1s, without providing Plaintiffs adequate notice or an opportunity to be heard, on the basis that "Needle EMG/NCVs performed by chiropractors are not recommended by the MTG. Rather it is recommended and preferred that needle EMG and NCVs be conducted and interpreted by physicians Board-certified in Neurology or Physical Medicine and Rehabilitation."

198. According to the MTG, needle EMG/NCVs are "recommended and preferred" to be "performed and interpreted by physicians board-certified in Neurology or Physical Medicine and Rehabilitation."

199. Dr. Jaff is a board-certified physiatrist, which, according to the American Board of Medical Specialties, is a specialist in Physical Medicine and Rehabilitation.

200. Dr. Jaff is not a chiropractor.

201. Thus, had Plaintiffs been afforded adequate notice and an opportunity to be heard, Plaintiffs would have been able to explain why the WCB's rejection of Plaintiffs' HP-1 submissions on this basis was improper.

202. However, the WCB failed to reconsider the HP-1 submissions and give Plaintiffs an opportunity to be heard, despite Plaintiffs' diligent efforts in contacting and following up with the WCB.

203. In other instances, the WCB improperly rejected Plaintiffs' HP-1 submissions for failing to timely submit bills, again without adequate notice or an opportunity to be heard.

204. Plaintiffs responded to these improper rejections by providing the WCB with proof that the bills were timely submitted.

205. Had Plaintiffs been afforded adequate notice and an opportunity to be heard, they would have been able to demonstrate to the WCB why the bills were timely submitted.

206. Despite this, the WCB failed to reconsider the HP-1 rejection and give Plaintiffs and opportunity to be heard.

207. Another reason that the WCB rejected multiple of Plaintiffs' HP-1 submissions was allegedly due to failing to submit a CMS-1500 form alongside a Form C-4.3.

208. Once more, the WCB failed to provide Plaintiffs adequate notice or an opportunity to be heard before issuing these rejections.

209. However, according to the WCB's guidelines, Form C-4.3 was not being replaced with the CMS-1500 form and it was merely recommended that a CMS-1500 form be attached to Form C-4.3 upon submission – it was not a requirement of the WCB.

210. In fact, the WCB's guidelines assert: "All versions of the C-4 medical billing forms (except the C-4.3) and the OT/PT-4 were replaced by the required submission of the CMS-1500 on July 1, 2022."

211. In August 2025, the Board altered the Form C-4.3 and included additional billing instructions as follows: "Submit form C-4.3 attached to electronically submitted CMS-1500 medical bill as the medical narrative."

212. Prior to August 2025, there was no requirement to submit a CMS-1500 along with Form C-4.3 and all those bills and HP-1 submissions were appropriate.

213. Yet, the Board refuses to process these HP-1 submissions utilizing Form C-4.3 and thus, its rejection on this basis is improper according to its own rules.

214. Thus, had the WCB afforded Plaintiffs adequate notice and an opportunity to be heard, Plaintiffs would have been able to explain why the WCB's rejection of the HP-1s for alleged failure to submit a CMS-1500 form alongside a Form C-4.3 was improper.

215. Despite Plaintiffs' efforts to notify the WCB of their blatantly improper rejection on this basis and request processing of the HP-1s, the WCB has failed to rectify the issue or provide Plaintiffs with any opportunity to be heard regarding the improper HP-1 rejection.

216. In other instances, Plaintiffs' HP-1s were rejected because they contained multi-page CMS-1500 with the total on each page rather than solely on the final page.

217. Despite Plaintiffs correcting the HP-1s and resubmitting them, the WCB has failed to re-process the HP-1s, issue the appropriate award or otherwise provide Plaintiffs an opportunity to be heard.

218. The WCB has failed to provide guidance regarding multi-page CMS-1500 with a total on the final page.

219. To the contrary, according to the WCB, "CMS-1500 Initiative Requirements, CMS-1500 field matrix and examples," the total line on each CMS-1500 should contain "7 digits to the left and 2 digits to the right of decimal point."

220. Despite Plaintiffs' efforts to notify the WCB of their blatantly improper rejection on this basis and request processing of the HP-1s, the WCB has failed to rectify the issue or provide Plaintiffs with any opportunity to be heard regarding the improper HP-1 rejection.

221. Plaintiffs' HP-1s were also rejected because two separate CMS-1500s were used for the same dates of service ("**DOS**").

222. The WCB rejected these HP-1s on this basis again without providing Plaintiffs adequate notice or an opportunity to be heard.

223. The WCB requires use of a Diagnostic Testing Network ("**DTN**") for certain patients, the bill for which must be submitted directly to the DTN, rather than the insurance carrier.

224. A DTN is a company which contracts with WCB-authorized medical providers who have agreed to provide diagnostic tests, such as MRIs, CAT scans, PET scans, and other tests used to diagnose injury or disease.

225. An insurance carrier, third party administrator ("**TPA**"), or self-insured employer ("**SIE**") may contract with a DTN and require that all of its injured workers use a DTN to obtain diagnostic testing.

226. However, because the DTN does not process or pay for other services performed contemporaneously, such as evaluation and management codes, two separate CMS-1500s are generated for the same DOS: one is sent to the insurance carrier and the other is sent to the DTN.

227. This is the only process by which to submit CMS-1500s when a DTN is used.

228. Because the WCB has refused to process both CMS-1500s on the same day (which explains the two separate CMS-1500s being used for the same DOS) the WCB rejects these HP-1s.

229. Plaintiffs have alerted the WCB of this issue, but the WCB has failed to provide an adequate solution to its own processing error and continues to simply reject HP-1s on this improper basis.

230. If a patient does not receive notification through a Notice That Claimant Must Arrange for Diagnostic Tests & Examinations through a Network Provider ("**Form DT-1**") or equivalent form, the patient may obtain the diagnostic testing from any WCB-authorized provider.

231. However, on numerous occasions the WCB has upheld denials against the WC provider for services provided outside the DTN, when the patient denies receiving proper notice.

232. The WC provider is never granted an opportunity to provide this information to the ALJ.

233. If the insurance carrier complies with the notice requirements but the patient utilizes the services of a facility or provider, including the treating medical provider, that is not an affiliated network provider for diagnostic examinations and tests, then the insurance carrier is not liable for the cost of the diagnostic examinations and tests.

234. However, on numerous occasions the insurance carrier has denied payment for diagnostic testing on the basis that testing was performed "outside the network" when in fact the bills were submitted to the DTN.

235. The WC provider is never granted an opportunity to provide this information to the ALJ.

236. Often times, WC patients are not aware of a requirement to use a DTN.

237. In such instances where the WC provider's bill is disputed by the insurance carrier through form C-8.1, there is nothing prohibiting the WC provider from resubmitting the DTN.

238. Regardless, the WCB does not permit WC providers to cure this denial and resubmit to the DTN and frequently makes determinations against WC providers, even when such bills have been submitted or resubmitted to the DTN.

239. Form C-8.1 and Form C-8.4 are two types of forms used by insurance carriers to reject claims for payment.

240. Claims against Form C-8.1 rejections may be adjudicated before an ALJ, but these adjudications involve only the WC patient and the payor.

241. The WC provider is not permitted to participate in these adjudications.

242. In many instances, the WCB has permitted the insurance carrier to simultaneously submit Form C-8.1 and Form C-8.4 with identical objections, thereby affording the insurance carrier the chance to adjudicate the same issue twice.

243. However, on multiple occasions, the WCB has refused to process HP-1 submissions due to an outstanding C8.4 even though the C8.1 was already determined in favor of the WC provider by an ALJ after a hearing.

244. The WCB has repeatedly permitted insurance carriers to misuse Form C-8.4 as a secondary means of denying payment, even when the primary Form C-8.1 has been resolved in favor of the WC provider.

245. The WCB has also made Form C-8.4 determinations in favor of the insurance carrier, denying payment to WC providers, without the WC providers having any opportunity to be heard or appeal these determinations.

246. In most instances wherein the WCB rejects an HP- 1, Plaintiffs would re-submit them, and the WCB would then reject them again as being untimely or just ignore the resubmission.

247. Had Plaintiffs been afforded adequate notice and an opportunity to be heard prior to the issuance of these rejections, Plaintiffs would have been able to raise these issues.

248. Over the last several years, Plaintiffs have continuously and persistently followed up with the WCB to attempt to correct the hundreds of improper HP-1 rejections it has received, to no avail.

**H. Plaintiffs Suffer a Deprivation of Property as a Result of Defendants**

249. Since the Board changed the WCB process in or around some time in 2022, Plaintiffs have spent an inordinate amount of time and energy submitting and following up on WC claims.

250. Since the Board changed the WCB process in or around some time in 2022, Plaintiffs have lost approximately $575,000 in labor, equipment, and supplies relating to services rendered to injured workers in New York without any payment.

251. To date, the total number of rejected HP-1s for which Plaintiffs have tried to respond or provide additional information reflects hundreds of outstanding forms.

252. Plaintiffs to date have not received payment for not less than forty-eight (48) depositions, which remain unaddressed by the WCB.

253. This deprivation of property is a direct result of the flawed procedural process implemented by the Board that does not provide WC providers the ability the opportunity to be before being deprived of moneys they may be duly owed.

254. Additionally, Plaintiffs are denied statutory interest owed.

255. Plaintiffs – who have outstanding HP-1s before the WCB and anticipate submitting more HP-1s in the future – and the Class will continue to be denied due process in similar fashion as outlined herein under the new WCB process implemented by the Board at some time in or around 2022.

**I. Plaintiffs Have No Form of Relief Under the New WCB Process Implemented by the Board**

256. Although there are various hearing and appeal options available for different types of WCB decisions, WC providers who treat injured worker have neither a right to hearing on decisions involving the nonpayment of medical bills, nor standing to appeal decisions of the WCB related to HP-1 rejections.

257. The WCB does not consider a WC provider to be an interested party under the WCL.

258. Similarly, the WCB does not consider a WC Provider to have standing to seek Board Review of the nonpayment of medical bills by an insurance carrier.

259. When an insurance carrier decides not to pay the WC provider, the WC provider's only option is to file an HP-1 with the WCB.

260. When the WCB issues a decision regarding an HP-1, the healthcare provider has no opportunity to appeal the decision.

261. Since some time in or around 2022, when the Board overhauled WCB's HP-1 process, WC providers have been denied the chance to appear for a hearing before a WCLJ on their claims or disputes involving unpaid medical bills by the insurance carriers.

262. Since some time in or around 2022, when the Board overhauled WCB's HP-1 process, WC providers have been deprived adequate notice or an opportunity to be heard before their HP-1s are rejected, sometimes as in little as two days.

263. Plaintiffs and the Class are left with no recourse to request payment by the insurance carriers for the services they provided to injured workers.

264. Plaintiffs and the Class have no remedies currently available to them under the overhauled system implemented by the Board in or around some time in 2022 and have been and will continue to be deprived of property without adequate notice or the opportunity to be heard.

## CLASS ACTION ALLEGATIONS

265. Plaintiffs bring this class action pursuant to Rule 23(a) and (b) of the Federal Rules of Civil Procedure on behalf of class defined as follows:

> All healthcare providers in New York State that participate in the Workers Compensation System and who: (a) have properly filed, or will in the future file, claims for payment of medical bills for services provided to injured employees within the Workers Compensation System; (b) have not received, or do not in the future receive, payment by an insurance carrier; (c) have properly submitted, or will in the future properly submit, an HP-1 form to the WCB; and (d) have not been provided, or will not be provided, adequate notice and/or an opportunity to be heard regarding the HP-1 form.

266. There are an estimated 22,014 WC providers in the WC system.

267. As such, the Class is so numerous that joinder of all members is impractical.

268. There are questions of law and fact common to the class, to wit, whether (a) Defendants' failure to provide the Class with an opportunity to be heard regarding their HP-1s before depriving them of money they are duly owed violates their constitutional right to due process under the United States and New York State Constitutions.

269. The claims of the named Plaintiffs are typical to the claims of the Class. All claims arise from Defendants' same course of conduct and administrative practices.

270. The named Plaintiffs can fairly and adequately protect the interests of the Class. Plaintiffs are represented by Weiss, Zarett, Brofman, Sonnenklar & Levy, P.C., attorneys with extensive experience in the courts of this state and in the Southern District.

271. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Indeed, only a class remedy will afford relief to those already victimized by the challenged policies and practices of Defendants.

272. Due to the complexity of the issues raised by this action, it is unlikely that a substantial number of individual actions would be brought by the members of the proposed class.

**AS AND FOR A FIRST CAUSE OF ACTION**

**(For Declaratory Judgment and Injunctive Relief Under 42 U.S.C. § 1983 and Article 1 of the Fourteenth Amendment to the United States Constitution)**

273. Plaintiffs repeat and reallege paragraphs 1 through 272.

274. 42 U.S.C. § 1983 creates a cause of action on behalf of "any citizen of the United States" who has been deprived of "any rights privileges or immunities secured by the Constitution and laws" against any person acting "under color of any statute, ordinance, regulation, custom or usage."

275. Article 1 of the Fourteenth Amendment to the United States Constitution prohibits a state from depriving "any person of life, liberty, or property, without due process of law…."

276. Defendants' current policies and practices regarding HP-1 determinations and their guidance regarding medical billing disputes fail to afford Plaintiffs and the Class with any sort of adequate notice or opportunity to be heard before deciding whether these WC providers are entitled to payment for services and/or goods they provided within the WC system.

277. Defendants' current policies and practices regarding HP-1 determinations and their guidance regarding medical billing disputes fail to afford Plaintiffs and the Class with an opportunity to collect statutory interest.

278. Defendants' policy and practice of failing to provide any sort of adequate notice or opportunity to be heard before determining whether Plaintiffs and the Class are entitled to payment for services and/or goods they provided within the WC system, is arbitrary, capricious and violates the Due Process guarantees of the Fourteenth Amendment to the United States Constitution, Article I.

279. Defendants' policy and practice of failing to provide a process for Plaintiffs and the Class to appeal HP-1 rejections while insurance carriers and WC patients have appeal rights is further arbitrary, capricious and violates the Due Process guarantees of the Fourteenth Amendment to the United States Constitution, Article I.

280. Defendants, individually and collectively, under color of law and at all relevant times, have deprived Plaintiffs and the Class of their individual rights through their failure to provide adequate notice, an opportunity to be heard regarding HP-1 determinations and/or a process to appeal HP-1 rejections.

281. For all the reasons asserted herein, Defendants have acted in violation of, and continue to act in violation of, 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution, Article 1.

282. As a result of Defendants' unconstitutional policy and practice, Plaintiffs and the Class have suffered and will continue to suffer significant economic loss, including but not limited to, lost income and reimbursements, which harm will be ongoing without permanent injunctive relief.

283. Plaintiffs and the Class are therefore entitled to (i) a declaratory judgment that Defendants' policy and practice of failing to provide a process for Plaintiffs and the Class to appeal HP-1 rejections is further arbitrary, capricious and violates the Due Process guarantees of the Fourteenth Amendment to the United States Constitution, Article I and (ii) permanent injunctive relief against WCB's current practices in issuing HP-1 determinations.

**AS AND FOR A SECOND CAUSE OF ACTION**

**(For Declaratory Judgment and Injunctive Relief Under Article 1, § 6 of the New York State Constitution)**

284. Plaintiffs repeat and reallege paragraphs 1 through 283.

285. Article 1, § 6 of the New York State Constitution prohibits any person from being "deprived of life, liberty or property without due process of law."

286. Defendants' current policies and practices regarding HP-1 determinations and its guidance regarding medical billing disputes fail to afford Plaintiffs and the Class with any sort of adequate notice or opportunity to be heard before deciding whether these WC providers are entitled to payment for services and/or goods they provided within the WC system.

287. Defendants' policy and practice of failing to provide any sort of adequate notice or opportunity to be heard before determining whether Plaintiffs and the Class are entitled to payment for services they provided within the WC system, is arbitrary, capricious and violates the Due Process guarantees of Article 1, § 6 of the New York State Constitution.

288. Defendants' policy and practice of failing to provide a process for Plaintiffs and the Class to appeal HP-1 rejections while insurance carriers and WC patients have appeal rights is further arbitrary, capricious and violates the Due Process guarantees of Article 1, § 6 of the New York State Constitution.

289. As a result of Defendants' policy and practice which violate the New York State Constitution, Plaintiffs and the Class have suffered and will continue to suffer significant economic loss,

including but not limited to, lost income and reimbursements, which harm will be ongoing without permanent injunctive relief.

290. Plaintiffs and the Class are therefore entitled to (i) a declaratory judgment that Defendants' policy and practice of failing to provide a process for Plaintiffs and the Class to appeal HP-1 rejections is further arbitrary, capricious and violates the Due Process guarantees of Article 1, §6 of the New York State Constitution and (ii) permanent injunctive relief against WCB's current practices in issuing HP-1 determinations.

## AS AND FOR A THIRD CAUSE OF ACTION

**(For Declaratory Judgment and Injunctive Relief Under 42 U.S.C. § 1983 and Article 1 of the Fourteenth Amendment to the United States Constitution)**

291. Plaintiffs repeat and reallege paragraphs 1 through 290.

292. 42 U.S.C. § 1983 creates a cause of action on behalf of "any citizen of the United States" who has been deprived of "any rights privileges or immunities secured by the Constitution and laws" against any person acting "under color of any statute, ordinance, regulation, custom or usage."

293. Article 1 of the Fourteenth Amendment to the United States Constitution prohibits a state from depriving "any person of life, liberty, or property, without due process of law…."

294. Defendants' current policy and practice in rendering regular HP-1 determinations fail to explain how such determinations were made.

295. Defendants' policy and practice of rendering HP-1 determinations without explaining how such determinations were made are arbitrary, capricious and violate the Due Process guarantees of the Fourteenth Amendment to the United States Constitution, Article I.

296. Defendants, individually and collectively, under color of law and at all relevant times, have deprived Plaintiffs and the Class of their individual rights through their failure to explain their HP-1 determinations.

297. For all the reasons asserted herein, Defendants have acted in violation of, and continue to act in violation of, 42 U.S.C. §1983 and the Fourteenth Amendment to the United States Constitution, Article 1.

298. As a result of Defendants' unconstitutional policy and practice, Plaintiffs and the Class have suffered and will continue to suffer significant economic loss, including but not limited to, lost income, which harm will be ongoing without permanent injunctive relief.

299. Plaintiffs and the Class are therefore entitled to (i) a declaratory judgment that Defendants' policy and practice of failing to explain HP-1 determinations is further arbitrary, capricious and violates the Due Process guarantees of the Fourteenth Amendment to the United States Constitution, Article I and (ii) permanent injunctive relief against WCB's current practices in issuing HP-1 determinations.

**AS AND FOR A FOURTH CAUSE OF ACTION**

**(For Declaratory Judgment and Injunctive Relief Under**
**Article 1, § 6 and Article IV § 8 of the New York State Constitution and**
**Article 2 and § 102[2](a) of the New York Administrative Procedure Act)**

300. Plaintiffs repeat and reallege paragraphs 1 through 299.

301. Article 1, § 6 of the New York State Constitution prohibits any person from being "deprived of life, liberty or property without due process of law.

302. Defendants' current policy and practice in rendering regular HP-1 determinations fail to explain how such determinations were made.

303. Defendants' policy and practice of rendering regular HP-1 determinations which fail to explain how such determinations were made are arbitrary and capricious and violate the Due Process guarantees of Article I § 6 of the New York State Constitution as well as the rulemaking provisions of Article IV, § 8 of the New York State Constitution and Article 2 and § 102[2](a) of the New York Administrative Procedure Act.

304. Defendants, individually and collectively, under color of law and at all relevant times, have deprived Plaintiffs and the Class of their individual rights through their failure to explain their HP-1 determinations.

305. For all the reasons asserted herein, Defendants have acted in violation of, and continue to act in violation of, Article I § 6 of the New York State Constitution, the rulemaking provisions of Article IV, § 8 of the New York State Constitution and Article 2 and § 102[2](a) of the New York Administrative Procedure Act.

306. As a result of Defendants' policy and practice which violate the New York State Constitution and New York Administrative Procedure Act, Plaintiffs and the Class have suffered and continue to suffer significant economic loss, including but not limited to, lost income and reimbursements, which harm will be ongoing without permanent injunctive relief.

307. Plaintiffs and the Class are therefore entitled to (i) a declaratory judgment that Defendants' policy and practice of failing to explain HP-1 determinations is further arbitrary, capricious and violates the Due Process guarantees of Article 1 § 6 of the New York State Constitution, the rulemaking provisions of Article IV § 8 of the New York States Constitution, and Article 2 and § 102[2](a) of the New York Administrative Procedure Act (ii) permanent injunctive relief against WCB's current practices in issuing HP-1 determinations.

**AS AND FOR A FIFTH CAUSE OF ACTION**

**(For Declaratory Judgment and Injunctive Relief Under Title 12, § 301.1 of the New York Administrative Code)**

308. Plaintiffs repeat and reallege paragraphs 1 through 307.

309. Under Title 12, § 301.1 of the New York Administrative Code, physicians who are required to attend a hearing of an injured employee that they treated are entitled to a fee of no less than $450.

310. The WCB instructs WC providers who have not been paid the fee to which they are entitled to contact the WCB for assistance after they have attempted to contact the payer directly.

311. Plaintiffs and the Class followed the WCB's instruction by first contacting the payer after 10 days without receiving payment, and then contacting the WCB ten (10) days after the letter was sent without receiving payment.

312. However, the WCB failed to direct payment to Plaintiffs and the Class for the medical testimony they provided in violation of Title 12, § 301.1 of the New York Administrative Code.

313. Plaintiffs and the Class are therefore entitled to (i) a declaratory judgment that Defendants' policy and practice of failing to direct payment to providers for medical testimony violates Title 12, §301.1 of the New York Administrative Code, and (ii) permanent injunctive relief against WCB's failure to direct payment for medical testimony.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiffs respectfully ask this Court to:**

A. Assume jurisdiction of this action pursuant to 28 U.S.C. §§ 133, 1337 and 1343(3), and the principles of pendent jurisdiction.

B. Enter an order pursuant to Rule 23(a) and (b) of the Federal Rules of Civil Procedure that this action may be maintained as a class action on behalf of the proposed class.

C. Enter a final judgment pursuant to 28 U.S.C. § 2201 and Rules 54 and 57 of the Federal Rules of Civil Procedure declaring that:

1. Defendants' policies and practices of failing to provide a process to appeal HP-1 rejections or an opportunity to be heard prior to determining whether Plaintiffs and the Class are entitled to payment for services and/or goods they provided within the WC system violate the Fourteenth Amendment of the United States Constitution and Article 1, § 6 of the New York State Constitution;

2. Defendants' guidance regarding medical billing disputes which fails to provide an opportunity for Plaintiffs and the Class to be heard prior to depriving them of payment for their services and/or goods violates the Fourteenth Amendment to the United States

Constitution, Article 1, § 6 of the New York State Constitution and the rulemaking provisions of Article IV, § 8 of the New York State Constitution and Article 2 and § 102[2](a) of the New York Administrative Procedure Act;

3. Defendants' policy and practice of rendering regular HP-1 determinations which fail to explain how such determinations were made violate the Due Process guarantees of the Fourteenth Amendment to the United States Constitution and Article I § 6 of the New York State Constitution;

4. Defendants' failure to provide assistance and direct payment for unpaid fees for medical testimony violates Title 12, § 301.1 of the New York Administrative Code;

5. Defendants have violated 42 U.S.C. §1983.

D. Enter a final judgment pursuant to 28 U.S.C. § 2202, 42 U.S.C. § 1983 and Rule 65 of the Federal Rules of Civil Procedure enjoining Defendants from failing:

1. To render HP-1 determinations which adequately explain how determinations of HP-1 rejections were made;
2. To provide adequate notice and an opportunity for Plaintiffs and the Class, who are WC providers within the WC system, to be heard regarding their HP-1 submissions;
3. To provide an opportunity for Plaintiffs and the Class, who are WC providers within the WC system, to appeal their HP-1 rejections;
4. To modify WCB policies to provide adequate notice and an opportunity for Plaintiffs and the Class to be heard regarding medical billing disputes;
5. To modify WCB policies to provide an opportunity for Plaintiffs and the Class to appeal medical billing disputes; and
6. To render assistance to Plaintiffs and the Class who have not received payment for providing medical testimony.

7. To modify WCB policy to provide adequate opportunity for Plaintiffs and the Class to receive statutory interest on late payments.

E. Award Plaintiffs' counsel a reasonable attorney's fee and litigation-related costs and disbursements pursuant to Rule 54(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 1988.

F. Grant such additional and further relief as this Court may deem just and proper.

Dated: September 29, 2025
New Hyde Park, New York

**WEISS ZARETT BROFMAN SONNENKLAR & LEVY P.C.**
*Attorneys for Plaintiffs*

By: /s/ Lisa Giunta-Popeil
Lisa Giunta-Popeil, Esq.
Katie O'Leary, Esq.
Joshua D. Sussman, Esq.
3333 New Hyde Park Road, Suite 211
New Hyde Park, New York 11042
(516) 627-7000